**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                    )
**MATHEW J. HILL,**                        )
                                    )
          **Plaintiff,**              )
                                      )         **Civil Action No. 13-11497-DJC**
       **v.**                        )
                                      )
**CAROLYN COLVIN, Acting Commissioner,**  )
**Social Security Administration,**          )
                                      )
          **Defendant.**            )
_____)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                     **January 9, 2015**

## I.     Introduction

Plaintiff Mathew J. Hill ("Hill") filed claims for Social Security Disability Insurance ("SSDI") and supplemental security income ("SSI"). R. 34, 162-67.[1] Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Hill now brings this action for judicial review of the final decision of Carolyn Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on February 23, 2012, denying his claim. D. 1; R. 31-53. Before the Court are Hill's motion for judgment on the pleadings to reverse and remand for an award of benefits, D. 14, and the Commissioner's motion to affirm the ALJ's decision, D. 22. For the reasons explained below, the Court DENIES Hill's motion and ALLOWS the Commissioner's motion.

## II.     Factual Background

---

[1] Citations to the administrative record in this case, filed at D. 11, are referenced as "R."

Hill stopped working full time when he was 33 years old.  R. 47.  He previously worked as a tax analyst, a shipping and receiving clerk for two retail stores and a pizza cook and delivery person.  R. 58-60, 68, 205-09.  Hill filed applications for SSDI and SSI, alleging he was unable to work as of March 20, 2008 due to anxiety, panic attacks, agoraphobia and depression.  R. 34, 36, 162-67.  At the hearing, Hill's attorney amended the onset date of Hill's condition to January 31, 2009.  R. 34, 59.

## III.    Procedural Background

Hill filed applications for SSDI and SSI on February 23, 2010.[2]  R. 34, 162-67.  The Social Security Administration ("SSA") initially denied Hill's claims on June 10, 2010, R. 97-102, and again upon reconsideration on December 8, 2010, R. 104-09.  Hill requested a hearing before an ALJ, R. 110-12, which was held on February 2, 2012.  R. 55-75.  In a written decision dated February 23, 2012, the ALJ determined Hill was not disabled within the definition of the Social Security Act and denied his claims.  R. 31-53.  On April 23, 2013, the Appeals Council denied a request to review Hill's claim, rendering the decision of the ALJ the Commissioner's final decision.  R. 1-6.

## IV.    Discussion

### A.    <u>Legal Standards</u>

#### 1.    *Entitlement to Disability Benefits and Social Security Income*

A claimant's entitlement to SSDI and SSI turns on whether he has a "disability," which is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

---

[2] Hill's SSI application is not included in the certified record.  D. 15 at 1.

months." 42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do any of his previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

The Commissioner follows a five-step process to determine whether an individual has a disability, and, thus, whether the benefits should be granted. 20 C.F.R. § 416.920. All five steps are applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have or has not had within the relevant time period a severe medically determinable impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the condition for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, where the impairment does not meet the conditions of one of the "listed" impairments, if the applicant's "residual functional capacity" ("RFC") is such that he can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given his RFC, education, work experience and age, is unable to do any other work, the application is granted. Id.

2.    *Standard of Review*

This Court may affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and the record. 42 U.S.C. § 405(g). This review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). Under 42 U.S.C. § 405(g), this Court must accept the factual findings of the Commissioner as conclusive "if supported by substantial

3

evidence." 42 U.S.C. § 405(g). Substantial evidence exists where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). The reviewing Court must adhere to these findings "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Whitzel v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass 2011) (citing Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)). The ALJ's findings of fact, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, Manso–Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir.1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

**B.**   **Before the ALJ**

*1.*   *Medical History*

a.   Treatment Records

From March 19, 2008 to September 29, 2009, Dr. Scott Perman treated Hill. R. 254-62. These records include diagnoses of Hill for anxiety, panic disorder without agoraphobia and tobacco dependence. R. 254-62. At Hill's March 19, 2008 visit, a "medication check," Dr. Perman noted Hill "tapered off Effexor since [his] last visit" and was using Clonazepam. R. 261. Dr. Perman further reported Hill "[r]ecently lost job," was "about to lose [his] health insurance and [was] very stressed/anxious about this," but "[felt] getting back on meds would be helpful." Id. Dr. Perman "tapered up" Hill's dose of Effexor to a higher dosage and refilled the Clonazepam prescription. Id. Hill visited Dr. Perman again on April 9, 2008. R. 260. Dr.

Perman noted Hill had some increased stressors due to a job loss, but was "overall doing much better on meds." Id. After a December 15, 2008 visit, Dr. Perman noted Hill had "stopped Effexor and used Clonazepam sparingly until it ran out." R. 258. He also reported Hill's "anxiety had been much worse off meds, [and he was] looking to resume these." Id. By January 14, 2009, Hill had resumed Effexor and Clonazepam, R. 256, and was "[d]oing much better," his "panic and anxiety [] [were] well controlled," and Hill had "no current complaints." Id.

Dr. Maria Salvador, a psychiatrist, was Hill's therapist from July 23, 2009 to April 22, 2010. R. 267, 550-81. On July 23, 2009, Dr. Salvador diagnosed Hill with panic disorder with agoraphobia and alcohol abuse with psychological dependence. R. 580. Hill stated his reason for seeking counseling was because he was unable to leave the house to visit his mother, was afraid to drive and suffered from panic attacks, particularly while in malls and big stores. R. 572. He reported taking Effexor twice daily and Clonazepam three times a day for anxiety. Id.

On September 29, 2009, Hill called Dr. Perman's office complaining of increased anxiety, explaining he was "finding it hard to leave the house" and that "driving [was] impossible." R. 254. Dr. Perman refilled Hill's Effexor prescription and told Hill to follow up with him and his primary care physician. Id. On October 15, 2009, Hill reported to Dr. Salvador that he was consuming three to four cups of coffee per day, which Dr. Salvador advised might have contributed to his anxiety level. R. 569. On November 5, 2009, Hill stated he attended his roommate's birthday party without incident, although he felt "overwhelmed" by things he could not control and calling his attorney "created extreme anxiety for him." R. 560. On November 10, 2009, Dr. Salvador noted Hill "discontinued taking Effexor due to not seeing wanted results." R. 560. In a letter to Hill's attorney dated November 19, 2009, Dr. Salvador reported Hill had "intense anxiety and fear in relation to driving long distances" and described Hill's panic attacks

as consisting of "chills, sweating, and feeling as if he [were] dying." R. 267. Moreover, Dr. Salvador stated Hill's safety "could potentially be jeopardized if [] forced to drive," and that "the [daily] challenges [Hill] encounter[ed] . . . contribute[d] to his inability to acquire and maintain employment." Id.

On December 3, 2009, Dr. Debbie Fuentes, Hill's primary care physician, prescribed Paxil. R. 440, 561. That month, Dr. Salvador encouraged Hill to drive longer distances and noted on December 17, 2010 that Hill "drove further [with] his roommate." R. 558-59. On January 7, 2010, however, Hill told Dr. Salvador he "ha[d] not been able to leave his home" because his roommate went away for a week. R. 558. Hill was then admitted to McLean Hospital ("McLean") on January 10, 2010 for intoxication, depression and agoraphobia. R. 270, 332. He was discharged on January 14, 2010, and then attended five sessions of a partial hospitalization program at McLean from January 19, 2010 to January 29, 2010. R. 270-71, 282. According to a discharge summary report, Hill had been sober for more than a year but began drinking four to five days prior to his admission due to his roommate's absence. R. 270. Dr. Marc Silbret, the psychologist who treated him at McLean, prescribed several medications and observed Hill's condition improved by the time he was discharged. R. 284-85. Dr. Salvador noted Hill was "euphoric" on January 29, 2010 and was able to explain what he had learned in group therapy. R. 556.

Enid Snidman, an advanced practice registered nurse, treated Hill from February 16, 2010 to March 16, 2010. R. 470-85. In her initial evaluation, Ms. Snidman ruled out bipolar disorder, suggested Hill attend Alcoholics Anonymous, and asked Hill to consider taking Abilify. R. 482. According to Ms. Snidman's March 16, 2010 treatment notes, Hill reported his mood improved due to Abilify. R. 472-73.

Hill continued therapy with Dr. Salvador upon his release from McLean through April 22, 2010, R. 550-55, and then began outpatient treatment at NorthEast Health Services ("NorthEast") on June 1, 2010. R. 518. June and July 2010 progress notes indicated Hill's anxiety limited his ability to leave his home and interact with people, R. 503-04, and that "[h]is anxiety [was] largely due to boredom and being in the home." R. 505. On July 22, 2010, Dr. Peter Saltzman ("Dr. Saltzman"), a psychiatrist at NorthEast, evaluated Hill and diagnosed him with panic disorder with agoraphobia and depression. R. 677-81. In August 2010, Dr. Saltzman noted Hill was able to drive farther distances and that his level of anxiety had decreased. R. 675.

In a October 27, 2010 questionnaire, Dr. Saltzman indicated Hill did not have limitations related to his understanding and memory. R. 530. Dr. Saltzman did, however, report Hill was markedly limited in his ability to perform activities within a schedule, complete a normal workweek without interruptions due to psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods and travel to unfamiliar places or use public transportation. R. 530-32. Dr. Saltzman further explained Hill would experience episodes of decompensation in an unpredictable work environment, but was capable of low stress work. R. 532-33. Lastly, Dr. Saltzman observed moderate limitations concerning Hill's ability to work with others without being distracted by them. R. 530-31. January 2011 progress notes and a "quarterly case review," indicated that Hill's anxiety and depression decreased. R. 601, 669. On January 25, 2011, Dr. Saltzman noted Hill "had [decreased] anxiety attacks on Paxil" but was not sleeping well on Seroquel." R. 669. On March 8, 2011, Dr. Saltzman decreased Hill's dosage of Seroquel and prescribed Trazodone. R. 667.

On March 23, 2011, Dr. Saltzman outlined a plan to replace Hill's Paxil with Celexa, starting in late April, and noted that medication was helping him sleep. R. 663, 665. Dr.

Saltzman also noted Klonopin was continuing to decrease Hill's anxiety but he was still "not venturing out enough." R. 663. On May 17, 2011, Dr. Saltzman observed Hill was no longer experiencing panic attacks on Celexa, but still suffered from agoraphobia. R. 661. In August 2011, however, Dr. Saltzman reported Hill was going out more due to the effects of Celexa, although he was still suffering from sleeping problems. R. 659. On October 13, 2011, Dr. Saltzman noted Hill drove to therapy sessions four times, and that Klonopin was decreasing his anxiety. R. 657.

In a letter to Hill's attorney dated November 22, 2011, Dr. Saltzman explained Hill's condition "affect[ed] his ability to travel to and from unfamiliar places far from his home" and "limit[ed] his level of social and work functioning." R. 636. On December 13, 2011, however, Dr. Saltzman noted that Hill "came [to therapy] alone for [the first] time," although he needed a Klonopin due to the traffic. R. 655. A "quarterly case review," dated December 20, 2011, indicated Hill improved his anxiety coping skills and increased his ability to drive alone and travel farther away from home. R. 643.

b.      SSA Records

Dr. Carol McKenna, a state reviewing psychologist, evaluated Hill's case on June 5, 2010, R. 486-98, and completed a RFC, R. 499-501. Dr. McKenna concluded Hill could perform simple tasks involving "somewhat limited" contact with the public and co-workers which did not require extended time driving or use of public transportation. R. 501.

Hill completed a Function Report dated April 17, 2010, in which he listed taking his dog outside in the yard, going to the local convenience store and completing household chores among his daily activities. R. 195, 199, 201. Hill also reported he could take care of himself and prepare meals daily, R. 198-99, but experienced "severe anxiety," and "many phobias,"

including a fear of going too far away from home. R. 200, 203. He further stated he could not drive long distances, felt uncomfortable in public, avoided social activities and had trouble sleeping. R. 198, 201. According to Hill, his impairments affected his ability to concentrate, but not his understanding, ability to follow instructions or get along with others. R. 202-03.

In a Function Report dated October 11, 2010, Hill stated he could no longer "go distances," "travel," "drive" or "work." R. 221-22. Again, Hill reported "severe" anxiety, agoraphobia and trouble sleeping. R. 221, 223. Nevertheless, Hill stated he could take attend to his "personal care" (but "did not do [s] every day since [he did not] go out and therefore [did not] always see the point"), complete household chores, prepare basic meals and shop for household needs with a friend, although he needed occasional reminders to take his medications. R. 221-23. Lastly, Hill stated his concentration was limited, but he could follow spoken instructions if "made clear to [him]." R. 225.

On December 6, 2010, Dr. John Garrison ("Dr. Garrison"), a state reviewing psychologist, reviewed Hill's case. R. 536. Dr Garrison concluded "[Hill] had the mental capability to complete simple tasks" and affirmed Dr. McKenna's assessments. Id.

### 2. ALJ Hearing

During an administrative hearing held on February 2, 2012, the ALJ heard testimony from Hill and vocational expert ("VE") Peter Mazaro. R. 55-75.

Hill testified he previously worked as a tax analyst,[3] a shipping and receiving clerk at two retail stores and a pizza cook and delivery person. R. 58-60, 68. Although Hill collected unemployment benefits "in hopes of working," he stated he could not work despite seeing doctors and trying medications. R. 60.

---

[3] The VE testified Hill's job description better fit the title of "tax clerk," a semi-skilled occupation, rather than a "tax analyst," a more skilled job. R. 68.

In addition to anxiety, panic attacks, agoraphobia and depression, Hill noted he had a history of alcohol abuse but testified he had been sober for two years. R. 61. Despite his sobriety, Hill testified his anxiety and depression remained "the same." R. 61-62. Hill also stated he travelled four to five miles away from his home in 2009, but experienced anxiety while driving and would "turn around and go home before I made it [to work]." R. 62-63. Hill explained he missed "a lot of days" of work because he was "too busy focused on how . . . to get home" and felt "overwhelmed" by his tasks. R. 65.

When asked about the current state of his anxiety, Hill stated he had panic attacks "[a] few times a week depending on what [he] was attempting to do." R. 63. According to Hill, he experienced panic attacks if he was attempting to go to the supermarket, got "stuck in a line somewhere" or got too far away from home. Id. When asked about his depression symptoms, Hill testified he was often tired and "need[ed] a nap during the day." Id. Nevertheless, when asked about his treatment, Hill stated he attended therapy sessions "[e]very other week with [his] counselor and every other month with [] Dr. Saltzman." R. 62. Moreover, Hill testified he was "gradually" trying to increase the distance he could travel. Id. Hill further explained that, on good days, he walked his dog within a mile of his home, watched television, used the computer, prepared lunch and completed household chores. R. 63-64. On bad days, which occurred "[a] couple of days a week," Hill testified he struggled to go outside. R. 64-65.

The VE testified regarding available work for an individual of similar age, education and vocational background who was able to do simple, unskilled work, needed to avoid social contact with the general public and co-workers (except for occasional contact with a supervisor), did not have to travel, had a "low stress" job and could "maintain attention and concentration for two-hour increments throughout an eight-hour workday." R. 68-69. The VE testified that while

Hill's past work would not be suitable for such a person, such an individual could work as a mail sorter, a "checker I"[4] or an automobile detailer. R. 69-72. The VE also testified that these occupations existed in significant numbers in the regional and national economies. R. 69-70.

### 3. Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found Hill was not engaged in substantial gainful activity and had not been since January 31, 2009. R. 36. At step two, the ALJ found Hill had severe impairments of anxiety (panic attacks and agoraphobia), depression and alcohol abuse in remission. Id. At step three, the ALJ determined Hill did not have an impairment or combination of impairments that met one of the listed impairments in the Social Security regulations. R. 37-38. Hill does not contest the ALJ's findings as to steps one through three. At step four, the ALJ found Hill had the RFC to:

> perform a full range of work at all exertional levels, but with the following nonexertional limitations: the claimant is able to perform simple, unskilled work; he is able to maintain attention and concentration for two hour increments throughout an eight hour work day; he should avoid social contact with the general public and co-workers, but can maintain occasional social contact with supervisors; he should not travel as a regular part of his job duties; and he must work in a low stress environment, which is defined as requiring little to no use of judgment or changes in the work setting.

R. 38. The ALJ concluded that Hill was unable to perform any past relevant work. R. 47. At step five, however, the ALJ found there work existed in significant numbers in the national economy that Hill could perform based upon his age, education, work experience and RFC. R. 47. Accordingly, the ALJ concluded Hill was not disabled as defined by the Social Security Act. R. 48. Hill contests the ALJ's conclusion as well as his RFC determination at step four. D. 15 at 11-15.

### C. Hill's Challenges to the ALJ's Findings

---

[4] A "[c]hecker I verifies quality, quantity, condition, and value of types of articles purchased or produced against records or reports." R. 71.

Hill seeks reversal of the ALJ's decision or, alternatively, for the Court to remand Hill's case for further proceedings.  D. 15 at 1.  Hill challenges the findings regarding the ALJ's evaluation of opinion evidence, id. at 11-15, the ALJ's assessment of Hill's credibility, id. at 16-19, and the Appeals Council's failure to consider new evidence submitted after the ALJ's decision, id. at 19-20.  For the reasons discussed below, the Court denies Hill's motion and affirms the Commissioner's decision.

### 1.    Opinion Evidence

First, Hill alleges the ALJ violated the "treating physician rule" by affording "mixed" rather than "controlling" weight to the opinion of Hill's treating psychiatrist, Dr. Saltzman.  D. 15 at 12.  Hill further asserts the ALJ improperly assigned "controlling" weight to the opinion of a non-examining psychologist, Dr. McKenna.  Id.

Generally, an ALJ gives "controlling weight" to a treating physician's opinion if that opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) consistent with "other substantial evidence in [the claimant's] record."  20 C.F.R. 404.1527(c)(2).  Furthermore, it is well settled that an ALJ is not obligated to accept a treating physician's conclusions.  Guyton v. Apfel, 20 F.Supp.2d 156, 167 (D. Mass. 1998); see also Shaw v. Sec'y of Health and Human Servs., No. 93-2173, 1994 WL 251000, at *3 (1st Cir. Jun. 9, 1994) (unpublished decision); Rivera v. Sec'y of Health and Human Servs., No. 92-1896, 1993 WL 40850, at *3 (1st Cir. Feb. 19, 1993) (unpublished decision).

In Hill's case, the ALJ did not err in giving "mixed weight" to Dr. Saltzman's October 27, 2010 questionnaire because it was inconsistent with other evidence in Hill's record.  Specifically, the ALJ assigned "great weight" to the portions of the questionnaire indicating Hill had "little to no limitation in most areas of functioning."  R. 46.  The ALJ gave "little weight" to

portions of the questionnaire indicating moderate or marked impairments "particularly in light of [Dr. Saltzman's] November 22, 2011, letter reporting "[Hill's] anxiety and depression only affected his ability to travel to and from unfamiliar places far from his home." Id. The ALJ further observed Hill's treatment records indicated he made "significant improvements on medication since October 2010." Id. While Hill correctly notes that Dr. Saltzman's November 22, 2011 letter noted that Hill "entered individual mental health treatment for anxiety and depression which limit his level of social and work functioning," R. 636, the ALJ also based his opinion on additional treatment records indicating an increase in functioning. R. 46.

The ALJ must nevertheless consider the following six factors in determining the proper weight to give a treating doctor's opinion: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence in support of the medical opinion; (4) the consistency of the medical opinions reflected in the record as a whole; (5) whether the medical provider is a specialist in the area in which he renders his opinion; and (6) other factors which tend to support or contradict the opinion." Guyton, 20 F.Supp.2d at 167. The ALJ applies these same factors in determining the weight to give any other medical opinion. Moore v. Astrue, No. 11–cv–11936–DJC, 2013 WL 812486, at *7 (D. Mass. Mar. 2, 2013) (citing 20 C.F.R. § 404.1527(c)(1)-(6)). In addition, the ALJ must provide "'good reasons' regarding the 'weight [given to a] treating source's opinion.'" Guyton, 20 F. Supp. 2d at 167 (citation omitted).

The ALJ properly evaluated Dr. Saltzman's opinion in light of relevant evidence, including Dr. Saltzman's own treatment records and other medical opinions in the record. First, Dr. Saltzman's progress notes and a "quarterly case review" completed in January 2011 indicating an overall improvement in Hill's condition, R. 601, 669, contradict Dr. Saltzman's

October 2010 findings of marked impairments. Moreover, Dr. Saltzman replaced Hill's Paxil with Celexa in late April 2011, which was effective in curbing Hill's panic attacks by May 2011. R. 661, 663, 665. In August 2011, Hill also reported going out more due to Celexa, and he was able to drive to therapy sessions in October. R. 657, 659. Hill contends the ALJ misinterpreted Dr. Saltzman's November 22, 2011 letter as suggesting that Hill's "only" limitation was with respect to his ability to travel, D. 15 at 12, since the letter also discusses Hill's "level of social and work functioning," R. 636. The record, however, overwhelmingly supports the ALJ's proposition that Hill's condition mostly affected his ability to leave his home and drive longer distances. R. 254, 267, 282, 332, 477, 491, 502-04, 510, 566-67, 558, 643, 655, 657, 673, 675.

Other medical opinions in the record also suggest Hill's condition was responsive to medication, which substantiates the ALJ's rationale for giving Dr. Saltzman's opinion mixed weight. In 2008, Dr. Perman prescribed Effexor and Clonazepam. R. 262. Hill returned to Dr. Perman's office on April 9, 2008 and was "overall doing much better" on these medications. R. 260. When Hill next visited Dr. Perman in December 2008, he reported he stopped taking his medications and that his anxiety was "much worse" as a result. R. 257-58; D. 15 at 2. Dr. Perman again prescribed Effexor and Clonazepam. R. 258. When Hill returned on January 14, 2009, Dr. Perman observed Hill's "panic and anxiety [] [were] well controlled." R. 256-57.

Although Hill discontinued Effexor, R. 560, Dr. Fuentes prescribed Paxil shortly thereafter in December 2009. R. 440, 561. That month, Hill stated he was able to drive further. R. 558. While at McLean in January 2010, Hill reported Paxil successfully blocked his panic attacks "for a few years" and allowed Hill to drive. R. 270. Hill also reported he was taking Klonopin irregularly. Id. Dr. Silbret thus instructed Hill to take Klonopin regularly because "erratic use might [] precipitate [] withdrawal reactions difficult to distinguish [from] anxiety."

R. 271.  In addition to a regular schedule of Klonopin, Dr. Silbret prescribed Remeron, Seroquel and increased Hill's Paxil dosage.  Id.  Upon discharge, Hill "showed a good response to med[ication] changes."  Id.  Moreover, Dr. Silbret observed that Hill's memory and cognition were "intact," he had "good insight and judgment," and he "tolerated" being away from home. Id.

During the partial hospitalization program that followed Hill's hospitalization at McLean, Hill did not attend four scheduled sessions due to his inability to drive by himself but reported driving to at least two sessions with his roommate.  R. 282.  According to Hill, this was "the farthest distance he travelled by car in several months."  Id.  Hill further stated he successfully drove to a store and walked around.  Id.  On January 29, 2010, the last day of the partial hospitalization program, Hill "endorsed . . . going 'farther outside [his] comfort zone . . . [and] continued medication compliance."  Id.  On February 8, 2010, Dr. Fuentes reported Hill was "negative" for depression and anxiety.  R. 442.  In April 2010, Hill even told Dr. Salvador he filled out applications for part-time work near his home and was "hopeful" this would "alleviate [his] anxious [symptoms.]"  R. 551.  After Hill's last session with her, Dr. Salvador completed a "termination summary" dated April 22, 2010 and concluded "[Hill's] functioning improved to above [his] highest level."  R. 550.

Overall, other treating physician opinions before the ALJ, as well as Dr. Saltzman's own treatment notes, demonstrate that Hill's condition gradually improved with medications.  The ALJ's conclusion regarding the weight to give Dr. Saltzman's 2010 report of marked limitations in light of other evidence of improvement, R. 46, is therefore well-supported.  Because Dr. Saltzman's opinion was inconsistent with other substantial evidence in Hill's record, "the requirement of 'controlling weight' does not apply."  Shaw, 1994 WL 251000 at *3.  The ALJ,

therefore, did not fail to weigh Dr. Saltzman's opinion properly, especially since Dr. Saltzman's own treatment records undermined the portions of the questionnaire to which the ALJ gave little weight. Sexton v. Barnhart, 247 F.Supp.2d 15, 24 (D. Mass. 2003) (holding ALJ properly declined to give treating physician controlling weight where physician's opinion "was undercut by her own treatment notes which indicated [] [medication] had stabilized [the claimant's] condition").

Hill points out the ALJ improperly assigned controlling weight to Dr. McKenna's opinion since she did not examine Hill, but rather only reviewed his medical records. D. 15 at 13; SSR 96–2p, 1996 WL 374188, at *2 ( noting that "[a]lthough opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to 'controlling weight'"). Even so, the First Circuit has maintained that "nontreating, nonexamining sources may override treating doctor opinions, provided there is support for the result in the record." Shaw, 1994 WL 251000 at *4 (citations omitted); see also Rose v. Shalala, 34 F.3d 13, 18 (1st Cir.1994) (observing that while non-examining source opinions alone cannot constitute substantial evidence, "this is not an ironclad rule") (citations omitted); D.A. v. Colvin, No. 11–40216–TSH, 2013 WL 5513952, at *7 (D. Mass. Sept. 30, 2013) ( noting that "[b]ased on [the ALJ's] substantial review of the record and consistency with the record, the [nontreating] physicians could reasonably be given great weight, and the ALJ thus did not err in according such [weight]"). Accordingly, the proper weight given to a non-examining, non-treating physician "will vary with the circumstances, including the nature of the illness and the information provided the expert." Rose, 34 F.3d at 18 (citation and internal quotation marks omitted).

Furthermore, other courts in this circuit have held remand is not warranted solely because an ALJ erroneously assigns "controlling weight" to a non-examining source where the opinion is otherwise supported by the record. See, e.g., Foltz v. Barnhart, No. 04–219–B–W, 2005 WL 1353397, at *4 (D. Me. Jun. 7, 2005) (noting that "to the extent [a non-treating source's opinion] can be said to qualify as substantial evidence in support of the [ALJ's] [] finding, [the ALJ's] error in according it 'controlling weight' is harmless"); Torres v. Comm'r of Social Security, No. 04-2309, 2005 WL 2148321, at *1 (D. P.R. Sept. 5 , 2005) (concluding that where "medical diagnoses of plaintiff's treating sources [were] not clearly inconsistent with the RFC assessment prepared by a non-treating mental expert, . . . the lack of a RFC assessment from an examining medical expert [did] not render the ALJ's decision one unsupported by substantial evidence"). Nevertheless, an ALJ must offer an adequate explanation for assigning greater weight to a nonexamining source. See Mendoza v. Astrue, No. 10–cv–357–SM, 2011 WL 1770486, at *5 (D. N.H. May 10, 2011).

Here, after carefully outlining other medical evidence in the record, the ALJ justified giving controlling weight to Dr. McKenna's opinion because it was "consistent with the medical evidence as a whole and fully supported [the ALJ's RFC assessment]." R. 47. Dr. McKenna completed a "Psychiatric Review Technique" and determined Hill had anxiety disorder with panic, "most specific to long driving [and] closed spaces," R. 491, which, as previously discussed, is well-substantiated by the record. Dr. McKenna also concluded Hill was moderately limited in his ability to perform daily living activities and maintain social functioning, R 496, but was not significantly limited with respect to his understanding and memory. R. 499. Dr. McKenna's opinion is not only supported by the record, but consistent with Dr. Saltzman's

opinion that Hill's "social and work functioning" were limited, R. 636, while his understanding and memory were not. R. 530.

Dr. McKenna next completed a RFC assessment. R. 499-501. The only marked limitation Dr. McKenna reported was with respect to Hill's ability to travel to unfamiliar places and use public transportation, R. 500, a limitation that Dr. Saltzman also observed. R. 636, 532. In addition, Dr. McKenna observed moderate limitations related to Hill's ability to interact with others, concentrate and adapt. R. 499-500. Again, these findings are consistent with Dr. Saltzman's opinion. R. 530-32. Lastly, Dr. McKenna concluded that when not abusing alcohol, Hill was capable of completing simple tasks "in a setting with [] limited co-worker [and] public contact," where he would not be required to drive or use public transportation. R. 501. Although Dr. Saltzman reported other marked limitations, R. 530-32, he similarly indicated Hill could tolerate a low degree of work stress. R. 533. Furthermore, Dr. McKenna explained Hill was capable of social interaction and would be able to adapt to changes in his routine "with effort [and] utilization of appropriate coping skills." Id. Again, progress notes from NorthEast indicated Hill's coping skills had improved. R. 643.

Hill's case, therefore, is unlike cases where "the [c]ourt's determination of remand was based on the fact that medical reports and opinions of the treating physicians in the record were in stark contrast with [non-examining physician assessments]." Torres, 2005 WL 2148321 at *1; see also Abubakar v. Astrue, No. 11-10456, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012) (finding ALJ did not err in relying on non-treating physician opinion that was "consistent with the majority of medical evidence in the record"); contra Rosario v. Apfel, 85 F.Supp.2d 62, 68 (D. Mass. 2000) (reversing ALJ's decision because the ALJ "relied too heavily on conflicting and incomplete nontreating physicians' reports"); Mendoza, 2011 WL 1770486 at *5 (reversing

ALJ's decision where ALJ did not adequately explain rationale for giving controlling weight to non-examining physician and where "the opinions of the nonexamining physician and [the] treating physician [were] so dramatically different"); Martinez v. Com'r of Soc. Sec., 306 F.Supp.2d 98, 99 (D. P.R. 2004) (concluding that "[g]iven the [inconsistent] evidence of record, the [c]ourt [was] unable to determine that the ALJ's decision [was] supported by 'substantial evidence'").

Hill further argues the ALJ's reliance on Dr. McKenna's opinion is improper because Dr. McKenna did not review Hill's entire medical record. D.15 at 14. Dr. McKenna completed her report on June 5, 2010 and reviewed records from Dr. Fuentes and McLean as well as Dr. Salvador's November 19, 2009 letter. R. 498. Where, as here, substantial evidence supports the ALJ's decision, the ALJ did not err in relying on a non-treating physician's opinion even though the nontreating physician only reviewed part of the record. See Berrios Lopez v. Sec'y of Health and Human Servs., 951 F.2d 427, 431-32 (1st Cir. 1991) (finding non-treating physician opinion is entitled to greater weight than treating physician's contrary opinion if supported by substantial evidence); D.A., 2013 WL 5513952 at *8 (noting that "[a]n ALJ may [] rely on a state medical examiner's opinion where [] subsequently added medical evidence does not establish greater limitations") (citation omitted). Furthermore, as the ALJ noted, R. 44, Dr. Garrison reviewed Hill's updated medical records and ultimately affirmed Dr. McKenna's assessment. R. 536. Given subsequent medical evidence indicating Hill's condition improved, the ALJ's reliance on Dr. McKenna's opinion was reasonable.

For these reasons, the Court concludes substantial evidence supports the ALJ's decision.

2.      *Witness Credibility*

Next, Hill argues the ALJ failed to evaluate Hill's credibility properly. D.15 at 16-19. Although the ALJ found "[Hill's] medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [Hill's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent that they are inconsistent with the above [RFC] assessment." R. 45.

It is the ALJ's responsibility to "determine issues of credibility," "draw inferences from the record" and "resolve conflicts in the evidence." Irlanda Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation omitted). Where a claimant's statements about his symptoms are unsupported by objective medical evidence, the ALJ must consider the entire record in assessing a claimant's credibility. Cordero v. Colvin, No. 10–12104–DJC, 2013 WL 5436970, at *16 (D. Mass. Sept. 25, 2013) (citing SSR 96–7p, 1996 WL 374186, at *1-2). Moreover, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. Courts may defer to an ALJ's credibility determination if supported by substantial evidence. Autrey v. Astrue, No. 10–cv–30150–MAP, 2011 WL 1564442, at *4 (D. Mass. Apr. 25, 2011) (citation omitted).

According to Hill, the ALJ erred by improperly focusing on Hill's inconsistent statements regarding his alcohol abuse as well as the fact that Hill's condition improved. D. 15 at 15. Hill does not argue the ALJ improperly considered Hill's alcohol dependence in his disability determination. Id. at 17. Rather, similar to the claimant in Hayes, No. 12–30047–KPN, 2013 WL 2325174, at *6 (D. Mass. Apr. 30, 2013), Hill's contention is that the ALJ's consideration of inconsistencies related to Hill's alcohol abuse is erroneous in the context of determining

credibility.  D. 15 at 17.  This argument fails because it is well established that an ALJ may explicitly consider such evidence in assessing a claimant's credibility.  <u>Stefanowich v. Colvin</u>, No. 13–30020–KPN, 2014 WL 357293, at *4-5 (D. Mass. Jan. 30, 2014) (finding "ALJ adequately assessed the totality of the record, including . . . [the claimant's] inconsistent reporting regarding alcohol use, when assessing . . . credibility"); <u>Hayes</u>, 2013 WL 2325174 at *6 (citation omitted) (finding ALJ was entitled to view a claimant's drug dependency as undermining the claimant's complaints of pain); <u>McDonald v. Astrue</u>, No. 10-10896-DPW, 2011 WL 3562933, at *13 (D. Mass. Aug. 15, 2011) (finding ALJ did not err in considering claimant's prior alcohol abuse in assessing credibility).

Hill acknowledged that he had a history of alcohol abuse but testified he had been sober for two years.  R. 61.  Despite his sobriety, however, Hill explained his anxiety and depression remained "the same."  R. 61-62.  Hill further testified he continued to experience panic attacks and struggled to leave his home on "bad days."  R. 63-65.  On the other hand, Hill was able to meet with a counselor "every other week" and with his psychiatrist "every other month."  R. 62. Hill was also "gradually" increasing the distance he was able to travel from his home.  <u>Id.</u>  In light of medical evidence suggesting Hill's condition improved with medications, R. 256-57, 271, 282, 442, 558, 657, 659, the ALJ properly evaluated Hill's statements regarding alcohol abuse to explain periods of worsening.  R. 45-46; <u>Bamford v. Astrue</u>, No. 12-10575-JLT, 2013 WL 870228, at *1 (D. Mass. Feb. 14, 2013) (citations omitted) ( noting that "[t]he resolution of conflicts in evidence . . . [is] for the [ALJ], not for doctors or the courts").  Accordingly, the ALJ observed "the only notations by any treating source that [Hill was] unable to attend scheduled appointments were during the [partial hospitalization program] . . . [when] [Hill] was in early remission from alcohol abuse."  R. 46.  When Hill began treatment with Dr. Saltzman in June

2010, however, his alcohol dependence was in sustained, full remission. R. 651. Thereafter, Hill was able to drive and interact with others. R. 502, 510, 673, 675. Due to medication changes, Hill was also able to venture out and initiate visiting friends. R. 643, 655, 657, 659. This contradicts Hill's statement that his condition remained the same despite his sobriety.

Hill also takes issue with the ALJ's observation that Hill's condition improved, despite Hill's continued reports of anxiety. D. 15 at 18. Again, medical evidence establishes Hill's condition was responsive to medications and was gradually improving. Furthermore, as the ALJ noted, at least some periods of worsening appeared to be attributable to Hill's failure to take medications as directed. R. 560. "Where [a claimant] does not follow the prescribed medical advice which would remedy or reduce his impairments, such conduct is arguably inconsistent with his [subjective] complaints." Bamford, 2013 WL 870228 at *1 (quoting Torres-Gutierrez v. Sec'y of Health, Educ., and Welfare, 572 F.2d 7, 8 (1st Cir. 1978)) (internal quotation marks omitted).

To the extent Hill argues bipolar disorder should have factored into the ALJ's credibility assessment, the Court is not persuaded. First, Ms. Snidman ruled out bipolar disorder in February 2010. R. 482. While a clinician at NorthEast who completed an initial evaluation of Hill on June 1, 2010 listed "bipolar II" among Hill's diagnoses, R. 651, Dr. Saltzman's initial evaluation did not mention such diagnosis. R. 679. Lastly, Dr. Saltzman recorded Hill's only diagnosis as "bipolar II" in his October 2010 questionnaire, but failed to include anxiety, panic disorder and agoraphobia. R. 527. Dr. Saltzman's assessments and treatment notes did not thereafter mention "bipolar II." Where no other treating or examining source diagnosed Hill with bipolar disorder, it was not improper for this diagnosis not to have factored into the ALJ's assessment.

For all of the aforementioned reasons, the ALJ's credibility determination is supported by substantial evidence.  Moreover, the ALJ properly questioned Hill regarding his "daily activities, frequency and intensity of symptoms, precipitating or aggravating factors, effectiveness or side effects of medications, the type of treatment prescribed for him and any functional restrictions placed on him."  Cordero, 2013 WL 5436970 at *16 (citing Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 23 (1st Cir. 1986)); R. 61-64.  The Court, therefore, upholds the ALJ's assessment of Hill's credibility.

### 3.      Action by the Appeals Council

Lastly, Hill argues the Appeals Council erred in "fail[ing] to consider new and material evidence" in Hill's case.  D. 15 at 19.  The Appeals Council considers new evidence submitted after the ALJ's decision only if (1) the new evidence "relates to the period on or before the date of the [ALJ's] hearing decision;" (2) "[the claimant] show[s] [] there is a reasonable probability that the evidence, alone or when considered with the other evidence of record, would change the outcome of the [ALJ's] decision;" and (3) the SAA "misled" the claimant or the claimant had some limitation or "unavoidable" circumstance that "prevented [the claimant] from submitting the evidence earlier."  Moore, 2013 WL 812486 at *12 (quoting 20 C.F.R. § 405.401(c)) (internal quotation marks omitted).

After the ALJ's February 23, 2012 decision, Hill offered an August 24, 2012 report from Dr. Jeffery Rubin, a psychologist who interviewed Hill over the telephone and reviewed Hill's medical records from 2010 to 2012.  R. 23-27.  Dr. Rubin's report included, among other items, an accounting of Hill's past medical, psychological and occupational history as well as an assessment of Hill's present mental status.  R. 24-25.  According to Dr. Rubin, Hill "[was] significantly anxious" and "[met] the criteria" for panic and dysthymic disorders.  R. 25.  Dr.

Rubin further reported Hill's ability to remember and understand instructions was unimpaired, his ability to concentrate on work and deal with supervisors was mildly to moderately impaired and his ability to deal with stress at work was moderately-to-markedly impaired. R. 26. Overall, Dr. Rubin concluded Hill's "level of psychological disturbance resulted in a "[m]oderate-to-[m]arked psychological disability." R. 26-27.

Furthermore, Dr. Rubin stated Hill "is psychiatrically impaired to an extent that he is presently incapable of sustained competitive employment . . . ." R. 26 (emphasis added). Dr. Rubin also stated Hill's "present medical and emotional state" indicated that "any attempts to engage in employment at this point [are] likely to result in an acute deterioration in psychiatric functioning." Id. (emphasis added). Lastly, Dr. Rubin observed Hill's medications were "still being adjusted," and it was likely to take "more than a year" to find an "optimal balance" of medications such that Hill would be "fit to return to work." Id.

Hill also submitted a questionnaire completed by Dr. Rubin dated August 28, 2012. R. 15-22. This questionnaire indicated Hill's sole evaluation with Dr. Rubin was on August 24, 2012, R. 15, but also that the "earliest date" to which symptoms and limitations described in the questionnaire applied was 2008. R. 22. Dr. Rubin again indicated there was "no evidence of limitation" concerning Hill's understanding or ability to concentrate, except that Hill's ability to "perform activities within a schedule" and complete an uninterrupted workweek was "markedly limited." R. 18-19. Dr. Rubin also reported Hill was "markedly limited" in his ability to "travel to unfamiliar places or use public transportation," and experienced episodes of decompensation due to "panic attacks when events are not predictable [and] stable." R. 20. Nevertheless, Dr. Rubin observed Hill was capable of tolerating low levels of stress. R. 21.

Hill argues "remand is [] required" because the Appeals Council erred in failing to grant review based on Dr. Rubin's findings.[5] D.15 at 20. The Appeals Council considered a "medical source statement from [Dr. Rubin] dated August 24-28, 2012," but observed "the [ALJ] decided [Hill's] case through February 23, 2012." R. 2. Accordingly, the Appeals Council found this information "[did] not affect the decision about whether [Hill] [was] disabled beginning on or before February 23, 2012." Id.

The crux of Hill's argument is that the Appeals Council was "clearly mistaken" in concluding Dr. Rubin's findings did not relate to the relevant time period at issue. Id. at 19. Moreover, Hill contends this evidence was "material to the ALJ's decision" because it "directly contradicts" the ALJ's finding that Hill's condition improved. Id. at 20. In Mills v. Apfel, 244 F.3d 1, 6 (1st Cir. 2001), the First Circuit held courts may review the Appeals Council's refusal to review an ALJ's decision on the basis of new evidence where the Appeals Council "gives an egregiously mistaken ground for its action." (emphasis added). Here, it is not clear that Dr. Rubin's report and questionnaire, completed six months after the ALJ's decision, relate to the relevant time period from January 31, 2009 to February 23, 2012. Although the report recites Hill's past medical history, R. 23-26, it offers several conclusions about Hill's then present abilities. R. 26. The time period addressed by the questionnaire is also unclear. While the questionnaire reports the described symptoms are applicable as early as 2008, it also states that Dr. Rubin's first and only evaluation of Hill occurred on August 24, 2012, the date of the report. The report then states Dr. Rubin only reviewed medical records going back to 2010, which is inconsistent with the questionnaire. R. 15, 22-23. Whether Dr. Rubin's report and

---

[5] Hill also offered a December 27, 2012 "quarterly review" of Hill's case from NorthEast that indicated Hill made "excellent progress," had decreased anxiety and could travel further from his home. R. 13. Hill does not contend the Appeals Council erred in finding that this particular report did not relate to the relevant time period. D. 15 at 19-20.

questionnaire, therefore, merely recite Hill's past medical history for the purpose of assessing Hill's current abilities or whether these documents provide a "retrospective analysis" of Hill's overall condition is not obvious.  See Moore, 2013 WL 812486 at *13 (rejecting claimant's contention that new medical records related to the relevant time period where no retroactive assessment of claimant's condition was provided).  The Appeals Council's determination that these records did not relate to the relevant time period, therefore, is not the type of "egregiously" erroneous explanation for declining to review an ALJ's decision on the basis on new evidence that warrants remand.  See Mills, 244 F.3d at 5 (finding AC's denial of review was "entirely reasonable, even if its language was not perfectly apt").

Even if Dr. Rubin's report and questionnaire relate to the relevant time period, Hill fails to show that "there is a reasonable probability that the evidence . . . would change the outcome of the [ALJ's] decision."  20 C.F.R. § 405.401(c).  Dr. Rubin's findings are, in large measure, consistent with those reported in Dr. Saltzman's the October 27, 2010 questionnaire, which the ALJ determined were unsupported by the record.  The Court, therefore, is not convinced that an additional opinion from a non-examining source completed several months after the ALJ's decision would have been material.  Accordingly, the Appeals Council did not err in deciding not to consider post-decision evidence.

## V.    Conclusion

For the above reasons, the Commissioner's motion to affirm, D. 22, is ALLOWED and Hill's motion for judgment on the pleadings, D. 14, is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge